# 99 DTA 148

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL DE SAN JUAN**
**PANEL IV**

JUAN HORTA MERLY, SU ESPOSA AIDA L. DIAZ RIVERA Y LA
SOCIEDAD LEGAL DE GANANCIALES CONSTITUIDA POR AMBOS;
JUAN A. HORTA DIAZ Y AILEEN HORTA DIAZ
Demandantes-Apelantes

v.

PMC MARKETING, INC. H/N/C FARMACIAS EL AMAL Y SALEH YASSIN
Demandados-Apelados

Núm. KLAN-98-01159 / KLAN-98-01160

San Juan, Puerto Rico, a 10 de mayo de 1999

Panel integrado por su Presidente, Juez Rossy García
y los Jueces González Rivera y Ortiz Carrión

Rossy García, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Los recursos consolidados de epígrafe interesan la revisión y revocación de una sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (José M. Rodríguez Viejo, J.). Mediante ésta, dicho foro desestimó aquella parte de la demanda instada por los demandantes en la que se reclamó por el despido, alegadamente discriminatorio, del que fue objeto el co-demandante, Sr. Juan Horta Merly (Sr. Horta), el que aconteció en el momento en que ocurrió la fusión entre las Farmacias Moscoso y la co-demandada, Farmacias El Amal. ■ A tales efectos los demandantes habían invocado la protección y causa de acción contemplada en la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. sec. 146a *et seq.* ■ Se reconoció, no obstante, en el dictamen apelado, luego de determinar el foro de instancia que no medió causa justificada para el despido del Sr. Horta, la indemnización dispuesta en la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185a *et seq.*, para tales casos.

Al así dictaminar, el tribunal de instancia concluyó que estaba persuadido de que en la reclamación de los demandantes bajo la Ley Núm. 100 hubo una ausencia de discrimen, a cuyos efectos consignó en su sentencia que la co-demandada, Farmacias El Amal, *"ha[bía] demostrado con preponderancia de prueba a nuestra satisfacción que el despido de[l Sr.] Horta no fue discriminatorio"* y que, *"aún interpretando la prueba liberalmente a favor de los derechos del trabajador"*, procedía dictar sentencia desestimatoria en cuanto a la acción por despido discriminatorio. Concedió así, como remedio, aquél dispuesto en la Ley Núm. 80, *supra*, y condenó a la parte querellada, Farmacias El Amal, a satisfacer al querellante la suma de $22,461.33, cantidad que corresponde a la mesada dispuesta por ley. Lo impuso, además, la cantidad de $5,615.33 por concepto de honorarios de abogado, equivalente ésta a un 25% de la indemnización concedida al reclamante. ■

Notificado como fue dicho dictamen, y luego de que una moción solicitando conclusiones de hechos y de derecho adicionales presentada por la demandada, Farmacias El Amal, fuera denegada mediante resolución y orden notificada el 18 de septiembre de 1998, las partes litigantes de epígrafe presentaron recursos de apelación independientes en los que expresaron su inconformidad con los términos de la referida sentencia. Así, los co-demandantes interpusieron el recurso identificado como Núm. KLAN-98-01159, en el que esencialmente señalan, como fundamento de revocación, que erró el foro apelado *"al determinar que no hubo discrimen por edad habiendo determinado [el juzgador de hechos] que no había justa causa para el despido"*. ■

Por su parte, Farmacias El Amal presentó el recurso Núm. KLAN-98-01160. En éste imputa que incidió el foro de instancia, *"al decretar injustificado el despido del señor Horta"*, ■ por lo que nos solicita la revocación de dicho extremo para decretar la desestimación total de la demanda instada por los demandantes. ■ En atención a que en el recurso Núm. KLAN-98-01160 la demandada señaló errores dirigidos a impugnar la suficiencia de la prueba testifical, así como la apreciación que de ella hiciera el tribunal apelado, a su ruego autorizamos a dicha parte a someter un proyecto de exposición narrativa de la prueba testifical, ello bajo la Regla 19 de este foro. De igual forma, en aras de la economía procesal y por interesar los recursos de epígrafe la revisión de un mismo dictamen, acogimos con aprobación la solicitud que a tales fines hiciera Farmacias El Amal y ordenamos su consolidación. ■

Perfeccionado el recurso luego de someter las partes una exposición narrativa estipulada de la prueba (E.N. E.P.) y sus respectivos alegatos suplementarios, y encontrándonos en condición de dictaminar luego de un ponderado análisis de los escritos presentados y la referida E.N.E.P., ello a la luz del derecho aplicable y su jurisprudencia interpretativa, resolvemos que resulta procedente emitir sentencia confirmatoria de la apelada.

## I

El Sr. Juan Horta Merly (Sr. Horta) inició sus labores como empleado de las Farmacias Moscoso, Inc. en

mayo de 1984, corporación que eventualmente pasó a conocerse como Farmacias José Guillermo, Inc., aun cuando dicho negocio continuó operando como Farmacias Moscoso. Le correspondió, entonces, en el descargo de las funciones del puesto que pasó a ocupar, la organización del Departamento de Seguridad y Prevención de Pérdidas de las Farmacias Moscoso, el que pasó a dirigir. Permaneció en dicho puesto hasta el año 1986. Para ese entonces, surgió en la empresa una vacante para el cargo de vicepresidente del Area de Operaciones y el Sr. Horta fue nombrado para ocupar la misma. Ello no obstante, el Sr. Horta retuvo la responsabilidad de las funciones correspondientes a la vicepresidencia del Departamento de Seguridad y Prevención de Pérdidas, las que se fundieron con aquéllas propias del area de Operaciones, por cuya virtud se creó un nuevo cargo que llevó el título de Vicepresidente de Operaciones y Prevención de Pérdidas.

Según se desprende de autos, las responsabilidades y deberes que con el transcurso del tiempo le fueron delegadas por el presidente de la corporación, Sr. José Guillermo Moscoso (Sr. Moscoso), llevaron al Sr. Horta a convertirse, para todo propósito práctico y *"desde el punto de vista operacional"*, en la persona que *"corría la compañía"*. Asimismo surge que el Sr. Horta continuó ocupando dicho cargo hasta el mes de marzo de 1995, fecha en la que se verificó, por parte de PMC Marketing, h/n/c Farmacias El Amal, la adquisición de la totalidad de las acciones de Farmacias José Guillermo, Inc., h/n/c Farmacias Moscoso. A tenor de lo que se desprende de la E.N.E.P., el Sr. Horta describió los acontecimientos acaecidos el día 14 de marzo de 1995 como sigue:

*"Se reportó a trabajar normalmente como siempre lo hacía, y cuando se encuentra como a las once de la mañana en su oficina, el Sr. Luis Cintrón se presenta y le dice que él recibió una información de Jocelín González de que citara a los gerentes de farmacias, supervisores, para una reunión al próximo día por la mañana el día 15, a las diez de la mañana. Y a las farmacéuticas y los supervisores de servicios profesionales para por la tarde.*

*[...]*

*Horta dijo que no tenía conocimiento de que se hubiera realizado la transacción de venta porque se había caído tantas y tantas veces. Tomó el teléfono, llamó a Moscoso. Entonces, Moscoso le afirma que sí, de que había realizado la venta y el nuevo dueño era el señor Yassin. [...] Entonces él le preguntó a Moscoso, ¿y qué de mi estatus [sic]? Entonces Moscoso le dice, el señor Yassin va a tener una reunión con los ejecutivos por la tarde. Moscoso enfatizó que no saliera de la oficina. [...]*

*Pasó el tiempo y se quedó en la oficina espera y espera y espera. A las cinco salieron los empleados. Y él como estaba haciendo cosas, siguió trabajando.*

*Como a las cinco y cuarto, vio al señor Yassin pasar por frente de mi oficina. Miró el reloj, eran las cinco y cuarto.*

*Un ratito más tarde vino el señor Cintrón, y le dijo que fueran a la oficina. Fue con Cintrón a la oficina. Para sorpresa de él se sorprendió porque no había nadie en la mesa de conferencias. El señor Yassin estaba sentado en el escritorio del presidente. Se sorprendió. Yassin le indicó que se sentara. Se sentó. Cintrón se sentó al lado de él.*

*Notó a Yassin un poco nervioso. El le preguntó, qué es lo que pasaba. Entonces, Yassin le dice que se había realizado el negocio. Que la nueva compañía quería ahorrar dinero, y que había decidido relevarlo a él en otras palabras. Yassin iba a asumir las responsabilidades de las operaciones.* ■

*En similares términos se expresó el señor Saleh Yassin (Sr. Yassin), nuevo dueño de las 'Farmacias Moscoso', quien a tenor de la fusión corporativa que representó dicha transacción, el día de referencia le*

*informó al Sr. Horta que había optado por no retener sus servicios, ya que él mismo asumiría las funciones que el Sr. Horta realizaba para las Farmacias Moscoso, determinación que, según surge de la E.N.E.P., fue una decisión que el Sr. Yassin había tomado desde "antes de efectuar la compraventa [,] desde noviembre [de 1994]."* ▇ *En su virtud, el Sr. Horta "nunca trabajó para el Sr. Yassin".* ▇

Con este trasfondo, el 2 de octubre de 1995, y refiriéndose a este último acontecimiento, así como a otros eventos posteriores sobre los cuales alegó que *"el Sr. Saleh Yassin es Presidente de PMC Marketing, Inc. y como agente de dicha entidad, sin justificación de índole alguna, ya que el co-demandante Juan Horta Merly nunca trabajó bajo él, el 14 de marzo de 1995, lo despidió de su empleo alegando que él habría de realizar las gestiones que Horta Merly realizaba [,así como q]ue la actuación del Sr. Saleh Yassin como agente de PMC Marketing Inc. lo hacen a él también responsable, en adición [sic] a, la corporación, por todos los daños que dicha actuación le ha causado a la parte demandante",* los co-demandantes de epígrafe instaron la reclamación que nos ocupa, la que denominaron como una de 'Despido Injustificado' y de 'Discrimen por edad'. ▇ *A tenor, y luego de hacer referencia a los hechos básicos hasta aquí reseñados en cuanto a las circunstancias particulares que culminaron con el despido imputado por el Sr. Horta al Sr. Yassin, dichos litigantes alegaron "[q]ue la parte demandada inmediatamente después de despedir al aquí co-demandante Juan Horta Merly, hizo público dicho despido nombrando un sustituto describiéndolo como más joven y dinámico; de apróximadamente 36 años de edad[; q]ue dicha persona pasó a ocupar la misma posición que ocupaba el aquí compareciente Juan Horta Merly y/o [sic] a tener las mismas responsabilidades que tenía dicho co-demandante, razón por la cual es evidente que el despido fue uno discriminatorio por edad [; y que a] la fecha de su despido el Sr. Horta contaba con sesenta y dos (62) años de edad y, por lo tanto, está dentro del grupo protegido bajo las disposiciones contenidas en 29 L.P.R.A. [sec.] 151-1". En función de tales alegaciones y aduciendo que al amparo de las disposiciones de ley "quien discrimina por razón de edad y despide de su empleo sin justa causa incurre en responsabilidad civil por suma igual al doble del importe de los daños que haya causado al empleado así despedido", la parte demandante pasó a desglosar en su escrito los daños causados atribuibles al ingreso dejado de percibir, los que distribuyó entre los siguientes conceptos:* ▇

*"(i) el salario básico era de $65,200.00 anuales;*

*(ii) que los gastos de reprensentación libres ascendían a $1,100.00 mensuales, para un total anual de $13,200,00;*

*(iii) que disfrutaba del beneficio del uso de un automóvil marca Volvo 940, incluyendo la gasolina, mantenimiento, reparaciones y seguro de responsabilidad pública total, para un total aproximado que se estima en una suma anual no menor de $15,000.00;*

*(iv) tenía derecho a un bono anual garantizado no menor de $3,000.00;*

*(v) adicionalmente tenía derecho a un segundo bono que fluctuaba de año en año y se estima que el promedio era de una suma no menor de $4,000.00 anuales;*

*(vi) disfrutaba de un seguro de salud cuyo costo era de $126.00 mensuales, para un total no menor de $1512.00 anuales; y*

*(vii) disfrutaba de un seguro de vida de $65,000.00, cuyo costo mensual aproximado era de $196.00, para una suma anual no menor de $2,352.00".* ▇

Emplazada como fue la parte demandada, presentó su contestación a la demanda, la que fue posteriormente enmendada, en la que sólo aceptó los hechos básicos atinentes a la condición del Sr. Horta como empleado de

Farmacias Moscoso, así como que en la fecha señalada por los demandantes, PMC Marketing, h/n/c Farmacias El Amal, había adquirido la totalidad de las acciones en circulación de José Guillermo Moscoso, Inc., pasando a ser su único y exclusivo dueño. En oposición, y como defensa afirmativa, expuso, entre otras, que la razón por la cual no se retuvo al Sr. Horta en su empleo respondió a que *"[a]l ser adquiridas todas las acciones de la corporación demandada se determinó eliminar como tal el puesto que ocupaba el Sr. Horta y que el señor Yassin realizaría las mismas funciones que el Sr. Juan Horta Merly desempeñaba".* ▆▆ Asimismo negó la procedencia de la aplicación de las disposiciones de la legislación protectora del trabajo invocadas en el caso de autos, aduciendo que *"el despido del Sr. Juan Horta Merly fue uno justificado".* ▆▆

Completadas las alegaciones y luego de utilizar las partes los mecanismos de descubrimiento de prueba, se señaló el caso para una conferencia con antelación a juicio, a la que éstas comparecieron asistidas por sus respectivos abogados, ocasión en la que sometieron el correspondiente informe de conferencia preliminar entre abogados. En éste consignaron las estipulaciones alcanzadas, las respectivas teorías jurídicas, se definieron las controversias y se indicó la prueba testifical y documental que habrían de aportar las partes en apoyo a sus respectivas contenciones. En ocasión de dicha conferencia se dispuso, además, que se habría de fraccionar la vista en su fondo para adjudicar inicialmente la responsabilidad de la demandada, si alguna, bajo los estatutos invocados. Limitaron así las partes la controversia que sería inicialmente adjudicada, a la determinación de si medió justa causa para el despido y, *"de no haberla, si éste aconteció por razones discriminatorias por edad".* Fue así señalada la vista en su fondo para los días 17 al 21 de agosto de 1998, ésta para dilucidar la controversia atinente al aspecto de responsabilidad.

En ocasión de la vista en su fondo comparecieron la partes asistidas por sus respectivas representaciones profesionales y ofrecieron prueba testifical y documental en apoyo a sus respectivas contenciones. La prueba testifical de los demandantes consistió del testimonio de varios empleados y ex-empleados de Farmacias Moscoso, a saber, los señores Luis R. Cintrón Rosado (Sr. Cintrón), Director del Departamento de Recursos Humanos de Farmacias Moscoso; Edwin Delgado Cardona y Osvaldo Cardona Rosa, Gerentes de Distrito; William Rodríguez Méndez, Gerente de Farmacia; y William Huertas Colón, Gerente de Mercadeo, anunciado como testigo hostil por ser la persona de quien se alegó que sustituyó al Sr. Horta en sus funciones. Se ofreció, además, la declaración de la señora María Dolores Trinidad, ex Secretaria del Sr. Horta, y el testimonio del co-demandante Sr. Horta. Aunque anunció como testigo al Sr. Moscoso, dicha parte no lo presentó. Por otro lado, la prueba testifical de Farmacias El Amal consistió exclusivamente de las declaraciones vertidas por el Sr. Yassin.

Recibida como fue dicha prueba, así como aquélla documental que tuvieron a bien someter las partes, el foro de instancia tomó por sometido el caso, dictando en su día la sentencia cuya revisión nos ocupa. Además de recoger allí, como hechos probados, las estipulaciones alcanzadas por las partes -cuyo contenido esencial ha sido aquí expuesto- el juzgador formuló las siguientes determinaciones de hechos:

*"[...]*

*24. El señor Luis R. Cintrón Rosado (Cintrón) era el Director de Recursos Humanos antes de la adquisición de Moscoso por El Amal y continuó siéndolo para la fecha de la vista en los méritos. Bajo la administración de Moscoso, los empleados eran evaluados casi todos los años y la División de Personal o Recursos Humanos recogía sus datos personales. Una vez El Amal comienza a administrar, dejaron de evaluar a los empleados y de recoger datos personales para economizar tiempo y dinero. Funcionan ahora en esa división con menos personal.*

*25. El demandante Horta con la ayuda de Cintrón preparó a solicitud del entonces presidente de Moscoso, José Guillermo Moscoso, un organigrama del Departamento de Operaciones y Prevención de Pérdidas conjuntamente con los deberes y responsabilidades del personal clave de dicho departamento. [Referencia*

*omitida].*

*26. Los documentos [a] que se refiere el párrafo anterior fueron preparados a escasos tres meses antes de la adquisición de Moscoso por El Amal, a pesar de existir dicho departamento desde hacía mucho tiempo. Resulta obvio que fueron confeccionados para beneficio de la corporación adquirente del negocio. (Enfasis nuestro).*

*27. El 14 de marzo de 1998, luego de concluido el horario regular de trabajo, el demandante se reunió con el Presidente de El Amal, Saleh Yassin (Yassin) quien lo despidió informándole que no lo necesitaba, pues él haría sus funciones ya que éstas eran las mismas que desempeñaba en El Amal y su salario era muy alto y debía realizar ahorros. Resulta obvio que Yassin había examinado los documentos a que se refieren los anteriores dos párrafos. Horta le entregó copia de su resumé, el cual había llevado a la reunión y le pidió que reconsiderara, pues era un excelente ejecutivo y en realidad le salía barato a la empresa en términos de las funciones que realizaba. Yassin no le ofreció otra posición en la compañía pues entendió que no tenía plaza para ofrecerle considerando las funciones que ejercía y el salario que devengaba. (Enfasis nuestro).*

*28. Al día siguiente, el 15 de marzo de 1995, hubo una reunión en las oficinas centrales donde asistieron la alta gerencia de Moscoso y del Amal con los Gerentes de Distrito, los Supervisores Regentes y los Gerentes de Farmacias. Cintrón comenzó haciendo una presentación de los nuevos dueños y Yassin asumió el control, informando la nueva filosofía comercial, el nombre bajo el cual operarían por la experiencia que tenía en virtud de un estudio publicitario y de percepción de mercadeo, realizado por una compañía de mercadeo independiente, donde Moscoso era concebido como un profesional farmacéutico pero anticuado, mientras que El Amal era asociado con una joven modelo en cosméticos; presentó los ejecutivos de la empresa y la designación de William Huertas (Huertas) como una persona joven y dinámica que sería el Gerente General a cargo de Operaciones y ayudaría a Yassin en la administración del negocio, entre otros asuntos tratados.*

*29. Huertas era el Gerente de Mercadeo bajo Moscoso y al adquirir El Amal, asumió esencialmente las mismas funciones que ejercía Horta sin dejar de atender el área de mercadeo que mantuvo bajo su supervisión. La única función que Huertas no ejerció fue lo relativo a seguridad, pero esto sólo representa un cinco (5%) del trabajo que Horta realizaba en esta área. A Huertas le fue asignada la misma secretaria que antes fungía como secretaría de Horta y el vehículo de motor que el demandante utilizaba, luego de su entrega una semana después del despido por acuerdo con Yassin.*

*30. Una vez acontece la adquisición de Moscoso por El Amal, Yassin estableció una nueva filosofía de administración. Surge de varios de los testigos que la administración central y las farmacias funcionaban con menos empleados, los supervisores y empleados exentos del pago de horas extras trabajaban más horas, todos los ejecutivos intervenían en la administración del negocio aportando ideas y transcendiendo las fronteras de sus respectivos departamentos cuando era necesario. El sistema implantado por Yassin, giraba alrededor de él como líder máximo de la empresa. Los títulos en El Amal no eran importantes y la administración no funcionaba como una estructura vertical, sino horizontal; así la información fluia libremente y las partes y directrices eran establecidas rápidamente sin la lentitud y burocracia de una estructura vertical que encarecía la operación. Ante todo persiste la filosofía que los cargos autorizan pero no capacitan y que la productividad es lo esencial.*

*31. Inmediatamente después de la adquisición de Moscoso por El Amal, Yassin ordenó el despido de los tres agentes de seguridad, cuyas edades fluctuaban alrededor de los treinta años; solicitó la renuncia del Gerente de Distrito, Edwin Delgado Cardona, quien operaba también un negocio propio y por supuesto, el de Horta. También ofreció la mesada a aquellos empleados de la oficina central que quisieran irse. Ocho empleados aceptaron el ofrecimiento y dejaron de trabajar. Recibieron la mesada.*

*32. Horta administraba en Moscoso toda la fase de operaciones y mantenía informado al Presidente, Jose Guillermo Moscoso, a diferencia del Amal, donde Yassin administraba y Huertas era para todo fin práctico su ayudante. Las decisiones esenciales las tomaba Yassin quien presidía todas las reuniones semanales con los gerentes y las mensuales con los farmacéuticos regentes. Yassin trabajaba un promedio de 14 horas diarias.*

*33. **Yassin le solicitó a José Guillermo Moscoso las renuncias de los altos ejecutivos de la empresa antes de la adquisición** pero no sucedió así con todos los ejecutivos. **Yassin tomó la decisión de despedir a Horta antes de adquirir el negocio** y la edad de Horta no influyó en forma alguna. La única de los altos ejecutivos que permaneció trabajando en El Amal fue la Lic. Elba Martínez por razones atribuibles a su profesión de farmacéutica y en consideración a su salario, mucho menor al de los restantes ejecutivos incluyendo a Horta.*

*34. Tanto Horta como Huertas eran excelentes profesionales de gran eficiencia y responsabilidad.*

*35. Horta tenía una serie de beneficios en Moscoso, alguno[s] de los cuales constituyen sueldo. Recibía $1,100 mensuales de gastos de representación que no tenía que utilizar para tal concepto ni justificar en forma alguna y un bono anual no menor de $3,000. Esto representa un salario adicional mensual de $1,350 ó de $313.95 semanal. Si tomamos en consideración los 10 años que trabajó en la empresa equivaldría a $3,139.50. Añadiendo a dicha cantidad el salario adicional por el mes ($1,350) y la suma estipulada como derecho a mesada, de aplicar ésta con efectos retroactivos, en caso de determinar el Tribunal que el despido no estuvo justificado ($17,971.83), la cantidad total por mesada equivaldría a $22,461.33."*

En función de tales determinaciones, el Tribunal de Instancia concluyó *"que el despido no estuvo justificado. La empresa no probó conforme a derecho la necesidad económica que justificase el despido por tal razón".* (Enfasis en el original) Determinó, además, *"que El Amal no probó las circunstancias enumeradas en el Art. 2 de la Ley Núm. 80 del 30 de mayo de 1976, 29 LPRA 185b, sobre justa causa para el despido. Sustituir un trabajador por otro para economizar el sueldo mayor del primero, no constituye justa causa dentro de las circunstancias del presente caso bajo la disposición legal antes citada".*

De otra parte concluyó que:

*"[e]l despido del querellante no fue discriminatorio por razón de edad. Conforme surge de los hechos determinados, Yassin despidió a Horta para reemplazarlo por otra persona que desempeñase la labor por menos dinero. La edad de Horta no tuvo nada que ver con su despido, tampoco la edad de Huertas. Pura coincidencia. La referencia a Huertas como un joven dinámico en la reunión del 15 de marzo no puede tener el alcance pretendido por el demandante. El Amal emplea personas de diferentes edades, algunas de las cuales en la década de los sesenta y también hemos determinado que ocurrieron otros despidos por el mismo propósito, como en el caso de los agentes de seguridad, cuyas edades fluctuaban en la década de los treinta y los que voluntariamente renunciaron por la mesada mediante el ofrecimiento de la empresa. El Amal logró efectivamente rebatir la presunción de discrimen activada en este caso por el querellante... Algunos hechos que demuestran lo expresado son realizar menos funciones en el área de Recursos Humanos, como las evaluaciones anuales de los empleados y despedir al Gerente de Distrito Edwin Delgado Cardona por la percepción de Yassin que poseyendo Delgado un negocio propio le restaría interés y tiempo para El Amal, siendo esto contrario a su política de exigirle un esfuerzo mayor a sus empleados exentos del pago de horas extras. El querellante, por su lado, no pudo contrarrestar esta evidencia ni aportar prueba que debilitara la posición de El Amal en cuanto a la inexistencia del discrimen. (Enfasis en el original).*

*El Amal ha demostrado con preponderancia de prueba a nuestra satisfacción que el despido de Horta no fue discriminatorio. Nos ha convencido que la existencia del discrimen por edad es menos probable que su inexistencia aun interpretando la prueba liberalmente a favor de los derechos del trabajador, por ser la Ley*

*Núm. 100 de 30 de junio de 1959, 29 LPRA 146, un estatuto de carácter reparador.*

*Concluimos que el motivo determinante para el despido de Horta no fue su edad sino el interés de Yassin de conseguir otra persona que hiciese el trabajo por menos dinero, razón que no satisface los criterios de justa causa establecidos por ley y ante esta situación el querellante tiene derecho exclusivamente a la mesada".* (Citas omitidas). ■

Según se ha indicado, al así concluir el tribunal apelado dictó sentencia desestimando la causa de acción por despido discriminatorio al amparo de la Ley Núm. 100, *supra*, razón por la cual se hizo innecesaria una vista de continuación para determinar los daños alegados bajo dicho estatuto. A tenor, y habiendo recibido prueba para determinar el importe de la mesada a la que tenía derecho el co-demandante, Sr. Horta, con arreglo a las disposiciones pertinentes de la Ley Núm. 80, *supra*, dicho foro procedió a ordenar a la querellada, Farmacias El Amal, el pago de las cantidades correspondientes a dicha parte así como a su representación legal. Por los fundamentos que pasamos a exponer a continuación, resolvemos que resulta procedente emitir sentencia confirmatoria de la apelada.

## II
### A

La Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. sec. 146 *et seq.*, prohibe que se despida a un empleado o que se deje de emplear a una persona o se afecte negativamente en su empleo por razón de su edad, raza, color, religión, origen o condición social, origen nacional, o por sus ideas políticas o religiosas. Art. 1, 29 L.P.R.A. Sec. 146. A tenor, su Art. 3 establece expresamente una presunción controvertible de discrimen en ausencia de justa causa para el despido al disponer que *"[s]e presumirá que cualquiera de los actos mencionados en las secciones precedentes fueron cometidos en violación de las secs. 146 a 151 de este título, cuando los mismos hayan sido realizados sin justa causa. Esta presunción será controvertible."* 29 L.P.R.A. Sec. 148.

Como bien se ha expresado, el efecto de esta presunción es el dispuesto en la Regla 14 de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 14. Se transfiere al demandado el peso de persuadir al juzgador de hechos de que el despido no fue discriminatorio. Es decir, corresponde al patrono demostrar, mediante preponderancia de prueba, que no discriminó contra el empleado. *Soto v. Hotel Caribe Hilton*, 137 D.P.R. ___ (1994), **94 J.T.S. 128**, pág. 312. Así, para que pueda sostenerse un dictamen basado en un despido discriminatorio, no basta con que se concluya que el despido fue sin justa causa, sino que también debe surgir claramente que el mismo fue con intención o propósitos discriminatorios, *Id.*

En tales casos, y como bien ha expresado el Tribunal Supremo, la determinación inicial que debe realizar el juzgador es si el despido fue uno justificado. Para ello, y toda vez que la Ley Núm. 100, *supra*, no define lo que constituye justa causa, se utilizará como punto de referencia las disposiciones de la Ley de indemnización por despido injustificado, Ley Núm. 80, *supra; Báez García v. Cooper Labs., Inc.*, 120 D.P.R. 145, 155 (1987). Si fue un despido justificado, habrá concluido el análisis. ■ Ello no obstante, se ha postulado que aun en tal caso, *"debe dársele oportunidad al demandante de demostrar, mediante preponderancia de la prueba, que el motivo aducido constituye un mero pretexto y en realidad ha habido discrimen".* Belk v. Martínez, 146 D.P.R. ___ (1998), **98 J.T.S. 92;** *Soto v. Hotel Caribe Hilton, supra; Ibáñez v. Molinos de P.R. Inc.,* 114 D.P.R. 42 (1983).

Por su parte, el A.D.E.A. concede una causa de acción a toda persona entre la edad de los 40 a los 70 años que ha sido despedida de su empleo o que se la ha negado el mismo por tal fundamento. A tenor de sus disposiciones, los tribunales estatales están facultados para dirimir una controversia a su amparo, 29 U.S.C. secs. 626(c) y 216(b), por lo que el Tribunal Supremo ha pautado que, en su consideración, los tribunales deben observar la concurrencia de los requisitos que se han interpretado como que el demandante tiene que demostrar,

a saber, (1) que pertenece al grupo protegido por el estatuto, o sea, dentro de los 40 a los 70 años de edad; (2) que fue despedido; (3) que reúne los requisitos para ocupar el puesto; y (4) que fue reemplazado por alguien más joven. *Ibáñez v. Molinos de P.R., Inc., supra*, pág. 50 (1983). Establecida la convergencia de estos cuatro factores, se activa la presunción de que el despido se debe a un discrimen por edad, ello en ausencia de que el patrono produzca evidencia que, de ser creída, explique razonablemente el despido. Ahora bien, se ha considerado que en estos casos el fundamento del despido no tiene que constituir *'justa causa'* en estricto derecho por lo que será suficiente, para rebatir la presunción creada por el estatuto, que se demuestre que el despido no obedeció a discrimen por edad. *Id.*

Por otro lado, en el aspecto procesal, el A.D.E.A. dispone que el demandante no podrá instar acción civil ante los tribunales hasta que transcurran sesenta (60) días desde que haya presentado una querella ante la Comisión para la igualdad de oportunidades de empleo (E.E.O.C., por sus siglas en inglés), para lo cual el estatuto le concede al querellante un término de ciento ochenta (180) días, el que comienza decursar desde que ocurre el alegado acto discriminatorio. 29 U.S.C. 626(d). ■■

Finalmente, huelga decir que bajo cualquiera de los dos estatutos aquí considerados, para que se pueda configurar una causa de acción a su amparo se debe establecer la realidad de la existencia de una relación o potencial relación de empleado-patrono que inicialmente active el derecho del empleado o de la persona que solicita un empleo, a reclamar que alegadamente ha sido objeto del acto discriminatorio de que se trate. 29 L.P. R.A. sec. 146; 29 U.S.C. 621.

**B**

Retomando ahora lo que nuestro legislador ha estatuido que constituye justa causa para un despido, debemos iniciar por señalar que en nuestra jurisdicción no existe una prohibición absoluta que impida el despido de un empleado contratado por un tiempo indeterminado. Ello surge claramente del estatuto que, a la vez, pretendió conjurar la doctrina conocida como *'empleo a voluntad'* (employment at will), mediante la cual se había aceptado que *"toda ley que limitara la libertad del patrono a despedir a un obrero violaba el derecho que la Constitución le garantizaba sobre la libertad de contratación"*. Alberto Acevedo Colom, *Legislación protectora del trabajo comentada*, pág. 157. ■■

Así, y en lo pertinente, en el artículo 1 de la Ley Núm. 80, *supra*, popularmente conocida como Ley de Indemnización por Despido Injustificado o Ley de la Mesada, nuestro legislador dispuso que:

*"[t]odo empleado de comercio, industria o cualquier otro negocio o sitio de empleo, designado en elosucesivo el establecimiento, donde trabaja mediante remuneración de alguna clase contratado sin tiempo determinado, que fuere despedido de su cargo sin que haya mediado una justa causa, tendrá derecho a recibir de su patrono en adición [sic] al sueldo que hubiere devengado:*

*(a) El sueldo correspondiente a un mes por concepto de indemnización; si el despido ocurre en los primeros cinco (5) años de servicio; el sueldo correspondiente a dos (2) si el despido ocurre luego de los (5) años hasta los quince (15) años de servicio; el sueldo correspondiente a tres (3) meses si el despido ocurre luego de los (15) años de servicio;*

*(b) una indemnización progresiva adicional equivalente a una semana por cada año de servicio; 29 L.P.R.A. sec. 185(a) (Supl. 1998)."*

Surge claramente de dicha disposición que, en el balance de los intereses encontrados que se pretendió solventar con su aprobación, el derecho de indemnización de un empleado despedido se hace depender de que el patrono no pueda probar, mediante la preponderancia de la evidencia, que el despido de dicho trabajador estuvo

justificado. *Rivera Aguila v. K-Mart de P.R.*, 123 D.P.R. 599, 610 (1989*); Delgado Zayas v. Hosp. Ind. Med. Avanzada*, 137 D.P.R. ___ (1994), **94 J.T.S. 149,** pág. 500. De otra parte, pertinente resulta señalar que la protección de la tenencia en el empleo ofrecida por esta clase de legislación es extensiva a todo empleado, por lo que bajo su égida quedan igualmente amparados los llamados ejecutivos, administradores y profesionales, así como los agentes viajeros o ambulantes, lo que fue resuelto por nuestro más alto foro desde hace décadas. *Doyle v. Polypane,* 80 D.P.R. 224 (1958); *Hull Dobbs v. Tribunal,* 82 D.P.R. 77 (1961); Ruy N. Delgado Zayas, *Apuntes para el estudio de la legislación protectora del trabajo en el derecho laboral puertorriqueño,* San Juan (1988), pág. 123.

*"Para guiar la discreción del juzgador al momento de determinar la procedencia de una acción al amparo del estatuto bajo estudio, su artículo 2 establece distintas situaciones mediando las cuales se considerará que existe justa causa para el despido --de las que se ha dicho que no son exhaustivas-- por cuyos términos observamos que, de las causas enumeradas, unas le son atribuibles a las actuaciones del patrono y otras a la conducta del empleado."* ■

Observamos así que se establece como justa causa para el despido, desde la perspectiva de la conducta del empleado, que éste observe un patrón de conducta impropia y desordenada; que incurra en violación a las reglas y reglamentos de la empresa; o que el empleado no rinda su trabajo en forma eficiente o que lo haga tardía o negligentemente. De otra parte, considera justa causa para el despido, imputable al patrono, el cierre total, parcial o temporero de las operaciones; los cambios tecnológicos o de organización; y las reducciones en el empleo debido a un bajo volumen de negocio.

Debemos aquí señalar, además, en lo que respecta a la ausencia de causa justificada para un despido, que se considerará que ocurre un despido tácito cuando la renuncia del empleado está *"motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra".* Art. 5, 29 L.P.R.A. sec. 185e. En tales casos, cuando el patrono no puede justificar la rebaja de salario o categoría, *"por regla general el despido es injustificado".* Ruy N. Delgado Zayas, *supra*, pág. 122.

Ahora bien, independientemente de lo antes indicado, el Art. 6 de la Ley Núm. 80, *supra*, concede un tratamiento especial a los empleados frente a la situación particular del traspaso de un negocio en marcha y le impone deberes y obligaciones especiales a los patronos en tales casos. Así, provee y dispone dicho artículo que:

*"[e]n el caso del traspaso de un negocio en marcha, si el nuevo adquirente continúa utilizando los servicios de los empleados que estaban trabajando con el anterior dueño, se les acreditará a éstos el tiempo que lleven trabajando en el negocio bajo anteriores dueños. En caso de que el nuevo adquirente opte por no continuar con los servicios de todos o algunos de los empleados y no advenga en su consecuencia patrono de éstos [,] el anterior patrono responderá por la indemnización provista por las secs. 185a a 185m de este título[, y] el comprador deberá retener la cantidad correspondiente del precio de venta convenido respecto del negocio. En caso de que los despida sin justa causa después del traspaso, el nuevo dueño responderá por cualquier beneficio que bajo las secs. 185a a 185m de este título pueda tener el empleado que quede cesante, estableciéndose además un gravamen sobre el negocio vendido para responder del monto de la reclamación. 29 L.P.R.A. sec. 185f."*

Observamos así que el contenido de esta disposición establece ciertas normas que deben seguir el vendedor y el comprador de un negocio, por cuya infracción quedan obligados a indemnizar al trabajador de conformidad con la Ley Núm. 80, *supra*. Es por ello, además, que se ha interpretado que el empleado que es despedido sin llegar a trabajar para el que adquiere dicho negocio en marcha, ha sido objeto de un despido injustificado. ■

Ruy N. Delgado Zayas, *supra*, págs. 122-123.

Al analizar con detenimiento la citada disposición, varios son los conceptos que se desprenden, los cuales resultan pertinentes al caso que consideramos. En primer lugar, y partiendo de la base de que ha ocurrido el traspaso de un negocio en marcha -a lo cual nos referiremos con posterioridad en el curso de esta sentencia- claro resulta que la ley le reconoce al adquiriente de tal negocio la opción de retener a todos, a alguno o a ninguno de los empleados del anterior patrono. Cuando el nuevo dueño decide retener los servicios de los empleados del patrono vendedor del negocio, su responsabilidad hacia ellos es tal y como si hubiese sido él quien originalmente los empleó. En su virtud, se les acreditará a éstos, el tiempo que llevaban laborando para el patrono o patronos anteriores y en caso de posterior despido sin justa causa, se activará la última parte del Art. 6, *supra*, por lo cual *"responderá por cualquier beneficio que bajo las secs. 185a a 185m de este título pueda tener el empleado que quede cesante..."*.

Cuando ocurre la situación particular de que el nuevo dueño opta por no retener los servicios de alguno de ellos, por imperativo de ley el legislador considera que ese empleado, para todo propósito práctico, ha sido objeto de un despido injustificado por parte del anterior patrono, y le impone a dicho anterior patrono la obligación de indemnizar a ese empleado suyo a tenor de lo dispuesto en *"las secciones 185a a 185m"* del título 29 de L.P.R.A., Ley Núm. 80, *supra*. De otra parte, obvio resulta que, al optar por no retener a una persona empleada por el patrono vendedor, el adquirente de un negocio en marcha *"no adv[iene] en su consecuencia patrono de ést[e]"*. Art. 6, *supra*.

De otra parte, el legislador previó que el patrono anterior podría incurrir en el incumplimiento de tal obligación, subvirtiendo así el claro espíritu y la letra del referido artículo. A tenor, dispuso que el adquirente del negocio en marcha debía verificar, antes del traspaso, que el vendedor hubiese satisfecho al empleado así despedido el monto de la indemnización a que tiene derecho a tenor de lo dispuesto en el Art. 1 de la Ley Núm. 80, *supra*. De no ser tal el caso, autorizó a dicho adquirente a *"retener la cantidad correspondiente del precio de venta convenido respecto del negocio"*. Obvio resulta que, de no acatarse tal mandato, recae en dicho adquirente satisfacerle al empleado despedido la indemnización que le corresponde, obligación por la cual el legislador lo responsabiliza personalmente, según surge de las *"Guías para la interpretación de la Ley Núm. 80"*, a la pág. 47. Así, al establecer estas sencillas normas que vienen obligadas a observar ambas partes envueltas en la transacción que constituye el traspaso de un negocio en marcha, se aseguró el legislador de que el empleado que queda cesante por una razón que no le es imputable, y que tampoco constituye justa causa, no se vea privado de recibir la protección perseguida en tales casos, plasmada mediante la inclusión de las disposiciones del citado artículo 6 en la Ley de Indemnización por Despido Injustificado.

## C

Al considerar en este momento el concepto de *"traspaso de negocio en marcha"*, lo cual se hace necesario ante la realidad de que las partes litigantes la han obviado por completo en sus argumentos de derecho, observamos que la Ley Núm. 80, *supra*, no define el mismo. Su historial legislativo de igual forma guarda silencio. Por su parte, aun cuando las *"Guías para la interpretación y aplicación de la Ley Núm. 80"* nos indican que, en la evaluación de si ha ocurrido el traspaso de un negocio en marcha deben considerarse, por analogía, algunos de los elementos que caracterizan la figura jurídica del *"patrono sucesor"*, no se analizan allí cuáles.

Ello no obstante, la glosa se ha encargado de discutir la naturaleza jurídica de la *"empresa"* y señalar las diversas transacciones de las que puede ser objeto. Se ha dicho así que, como sinónimo de empresa, un negocio se compone de elementos tales como el nombre comercial, el local o locales donde opera, de las diversas clases de contratos que suscribe (de arrendamiento, seguros, suministros, etc.), de líneas de crédito, de cuentas por cobrar, patentes y marcas de fábrica, licencias, mobiliario y equipo, clientela, personal, gerencia, y otros.

Fernando Sánchez Calero, *Instituciones de derecho mercantil*, Ed. Rev. Der. Priv., Madrid (1988), pág. 115; José Fernández Ruiz, *El derecho y la empresa*, Ed. Deusto S.A., Bilbao (1981), pág. 87. Tales elementos constituyen, en conjunto, una unidad económica que puede ser objeto de tráfico jurídico. Raúl Etcheverry, *Manual de derecho comercial*, Ed. Astrea, Buenos Aires (1983), págs. 446-448; J. Girón Teña, *Sobre las características generales desde los puntos de vista político-jurídico y conceptual de los problemas actuales en torno a la empresa, Estudios de derecho mercantil en homenaje al Profesor Antonio Polo*, Ed. Rev. de Der. Priv. Madrid (1981), pág. 301.

Una de las posibles transacciones de las que puede ser objeto una empresa es la compraventa en bloque, con arreglo a lo cual se transfieren todos los elementos constitutivos del negocio como una unidad, la que continúa operando con un mero cambio en la identidad del empresario o titular. Cuando ello ocurre, se considera que ha tenido lugar el traspaso de un negocio en marcha. Emilio Langle y Rubio, *Manual de Derecho Mercantil Español*, Vol. II, Bosch, Barcelona (1954), págs. 44-47. En Puerto Rico se citan, como ejemplos de traspasos de un negocio en marcha, la fusión del Banco de Ponce y el Banco Popular, la compra de Pueblo International (XTRA) por la familia Cisneros y la compra del Royal Bank de Puerto Rico por el Banco Bilbao Vizcaya. Luis Acevedo Colom, *supra*, pág. 206.

Analicemos, a la luz del precedente marco jurídico y jurisprudencial, las circunstancias que concurren en el caso de autos y adjudiquemos, a tenor, los derechos y las obligaciones de las partes aquí comparecientes.

### III

Al considerar ahora la situación particular del caso que nos ocupa, debemos iniciar por señalar que al momento en que la co-demandada de epígrafe, PMC Marketing, h/n/c Farmacias El Amal, consumó la transacción mediante la cual advino dueña de la totalidad de las acciones de José Guillermo Moscoso, Inc., empresa que, entre otras, se dedicaba a la operación de las Farmacias Moscoso, entre tales partes contratantes se llevó a cabo lo que en nuestra jurisdicción se conoce como el traspaso de un negocio en marcha. Que ello es así, lo evidencia la concurrencia de un número significativo de los factores que se deben considerar al momento de hacer tal determinación, a saber, hubo una continuidad en la actividad del negocio, o sea, las farmacias siguieron operando luego del cambio de dueño; se siguió ofreciendo similar servicio al público; las farmacias permanecieron en los mismos locales en donde hasta el momento operaban; y se retuvo esencialmente la misma fuerza laboral trabajando en las distintas localidades en donde estaban ubicados tales establecimientos. En su virtud, el hecho de que no se hubiese conservado intacto el personal de supervisión, ni que se hubiese optado por no retener el mismo nombre comercial por el vendedor, no obsta para que determinemos que la transacción envuelta constituyó una compraventa en bloque, conforme a la cual PMC Marketing adquirió todos los elementos del negocio que constituia Farmacias José Guillermo, Inc. como una unidad, el que continuó operando con un mero cambio en la identidad de su titular. Emilio Langle y Rubio, *supra*. Esta conclusión encuentra apoyo, además, en las propias declaraciones del Sr. Yassin en ocasión de la vista en su fondo, las que no fueron controvertidas. En cuanto a este extremo, su testimonio fue a los efectos de que *"la compraventa de todo el conglomerado de Moscoso fue por más de veinte millones";* y que *"al hacer la transacción se vacían las cuatro corporaciones que existían haciendo negocios en lo que es PMC, para que sobreviva PMC Marketing Corp. haciendo negocios como Farmacias El Amal",* entre otras. A tenor, forzoso es concluir que la transacción que dio lugar a que se suscitaran los hechos que hoy consideramos, constituyó el traspaso de un negocio en marcha.

Alcanzada esta determinación, observamos que, en su correcta perspectiva, son las disposiciones del Art. 6 de la Ley Núm. 80, *supra*, las que controlan el *"despido"* del Sr. Horta -las cuales específicamente consideran los *"deberes de los patronos"* cuando ocurre el traspaso de un negocio en marcha- y no las del Art. 2, *supra*, como erróneamente asumieron y discutieron las partes litigantes. Apliquémoslas, pues, al caso particular de autos.

Según surge del expediente ante nos, la posibilidad de que ocurriera la adquisición de las Farmacias Moscoso por parte del Sr. Yassin se comenzó a auscultar desde el verano de 1994. Ya para noviembre de ese mismo año, y según fuera declarado por el Sr. Yassin, éste había tomado la decisión de no retener al Sr. Horta una vez ocurriera el traspaso, derecho que está plenamente reconocido en la Ley Núm. 80, *supra*, cuando indica que una de las alternativas del adquiriente, en cuanto al personal, es *"opt[ar] por no continuar con los servicios de todos o algunos de los empleados..."* del negocio que va seguir en marcha. Así, el Sr. Yassin no sólo optó por no retener al Sr. Horta, sino que, según su testimonio, le comunicó al Sr. Moscoso que, *"Como El Amal estaba comprando una corporación, y no unos activos, era necesario la renuncia de todos los directivos y vicepresidentes"*. ▮ Estas declaraciones no fueron controvertidas por la demandante, por lo que fueron adoptadas por el foro apelado como un hecho probado. ▮ De igual forma, y por existir *"duplicidad de funciones"*, no se retuvo personal de la oficina central, *"a quienes se les compensó con una mesada para renunciar"*.

A tenor de tal realidad, y habiendo optado el nuevo adquiriente por no continuar con los servicios de algunos de los empleados de Farmacias Moscoso, entre ellos el co-demandante, Sr. Horta, por mandato expreso de ley que contempla tal situación como un *"despido injustificado"*, el Sr. Moscoso, *"anterior patrono [del Sr. Horta, venía obligado a responder] por la indemnización provista por las secs. 185a a 185m de este título"*, con derecho el comprador, Sr. Yassin, para *"retener la cantidad correspondiente del precio de venta convenido respecto al negocio"*. Al no hacerlo, asumió total responsabilidad por el beneficio que le confiere al demandante el citado artículo 6, toda vez que, por expresa disposición de ley, para tal caso, el traspaso de un negocio en marcha no constituye causa justificada para el despido de un empleado.

Además, de un detenido análisis del artículo 6, quedamos advertidos de que en una situación como la que contemplamos en autos, donde el adquiriente de un negocio en marcha ejérce su derecho reconocido en ley de *"opt[ar] por no continuar con los servicios de todos o alguno de los empleados"*, el mismo *"no adv[iene] en su consecuencia patrono de éstos"*.

De otra parte, el hecho de que al adquiriente, por su inobservancia con lo allí dispuesto, le sea imputable responder por la mesada del empleado *'despedido sin justa causa'* por el anterior patrono al verificarse el traspaso de un negocio en marcha cuando opta por no retenerlo, no mejora la situación de tal empleado toda vez que la única consecuencia jurídica es que dicho adquiriente incurre en la obligación del pago de la mesada. Con este limitado alcance, claro resulta que en el caso de autos nunca se estableció una relación empleado-patrono entre el co-demandante, Sr. Horta, y el adquiriente, Sr. Yassin. Además, así lo reconoció la propia parte demandante-apelante en el recurso Núm. KLAN9-8-01159, tanto ante el tribunal de instancia como ante nos, al exponer en sus escritos que *"el co-demandante Juan Horta Merly nunca trabajó bajo él [,refiriéndose al Sr. Yassin]"*, ▮ y que *"[e]l señor Horta nunca trabajó para el señor Yassin"*. ▮

Finalmente, e independientemente de lo antes indicado, ante las imputaciones de un alegado *"despido discriminatorio"*, las que tuvo que enfrentar la parte demandada para rebatirlas, evidente resulta que el foro de instancia dictaminó con corrección al concluir que la determinación del Sr. Yassin de no retener los servicios del Sr. Horta no obedeció a propósito o intención discriminatoria alguna por razón de su edad. Así, quedó probado como realidad incontrovertida que el Sr. Yassin había tomado tal determinación cuando aún no se había materializado la compra del negocio de lo que denominó como el *'conglomerado'* José Guillermo Moscoso Inc. De otra parte, al ocurrir la fusión entre las dos corporaciones contratantes, por imperativo de la naturaleza de dicha transacción, el Sr. Yassin previó el surgimiento de una duplicidad de funciones en puestos similares procedentes de una y otra corporación al nivel de la administración central. A tenor, se eliminaron plazas y ocurrieron otros despidos de empleados cuyas edades estaban entre los veinte y los cuarenta años. ▮ Sobre el mismo aspecto, de la prueba desfilada y creída por el juzgador surgió que las Farmacias El Amal emplea personas en distintas capacidades de diferentes edades, aun en posiciones directivas, siendo el más joven un

empleado de dieciséis años, encontrándose los empleados de mayor edad dentro del mismo grupo generacional del Sr. Horta, o sea, alrededor de los sesenta años. ■ Por otro lado, adjudicándole deferencia a la determinación del tribunal *a quo* al respecto --foro que no encontró probado que la plaza del Sr. Horta hubiese quedado efectivamente eliminada-- ■ surge que la persona que alegadamente lo reemplazó en su *'puesto'* fue un empleado de Farmacias Moscoso con mayor antiguedad en la empresa que el Sr. Horta. Asimismo se desprende que las funciones del área de seguridad, las que igualmente ejercía el Sr. Horta en Farmacias Moscoso, fueron repartidas entre dos personas, una proveniente de cada una de las corporaciones fusionadas, las cuales habían comenzado a laborar en éstas con anterioridad a que el Sr. Horta se iniciara en sus labores como ejecutivo de Farmacias Moscoso. Fue todo ello lo que llevó a concluir al foro de Instancia que la decisión del Sr. Yassin de no retener al *"querellante no fue por razón de edad";* y que *"[c]onforme surge de los hechos determinados",* la verdadera razón fue *"reemplazarlo por otra persona que desempeñase la labor por menos dinero"* cuya edad, relativa a la del Sr. Horta, era *"pura coincidencia".* ■

Finalmente, alcanzada tal determinación por el juzgador de hechos, observamos, que el único indicio en la prueba recibida por el foro de instancia que apuntaba a la posible existencia de discrimen por razón de edad para no retener al Sr. Horta es que, al momento en que hizo referencia a la persona que iba a ser su ayudante, el Sr. Yassin lo presentó como *"un jóven dinámico".* Analizada en conjunto la prueba desfilada en el tribunal de instancia, coincidimos con dicho foro en que tal comentario no puede tener el alcance pretendido por la demandante para establecer, por sí sólo, una razón discriminatoria, y que el mismo es insuficiente para conceder que al Sr. Horta no se le retuvo en Farmacias El Amal por razón de su edad. ■

A tenor de esta última observación, no incidió dicho foro al concluir que en el caso de autos no se satisficieron los criterios pautados en *McDonell Douglas Corp. v. Green,* 411 U.S. 792 (1973) y *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981), jurisprudencia sentada por el Tribunal Supremo de los Estados Unidos, o en *Ibáñez v. Molinos de P.R., supra,* para establecer efectivamente una reclamación por razón de despido discriminatorio bajo alguno o ambos de los estatutos invocados por la demandante.

Por otro lado, asumiendo, para propósitos de argumentación -y considerando los hechos que dan lugar a la reclamación de la demandante de la forma más favorable hacia el Sr. Horta- que la entrega de su resumé por parte del Sr. Horta al Sr. Yassin constituyera una solicitud de empleo, y que el mismo se negó a emplearlo por razones discriminatorias relacionadas a su edad, los méritos de tal contención se desvanecen ante la realidad de que el Sr. Yassin no tenía disponible, ni estaba buscando llenar, una plaza para la cual pudiese utilizar los servicios del Sr. Horta, quien era la persona que *"corría la compañía"* en Farmacias Moscoso, según quedó probado como hecho incontrovertido, lo que adquiere mayor relieve y pertinencia tomando en consideración que el Sr. Yassin era el que personalmente ejercía tales funciones operacionales en las Farmacias El Amal. De otra parte, de las propias declaraciones del Sr. Horta surge que su *"expectativa"* de empleo con el Sr. Yassin no era otra que no fuera ejerciendo las mismas funciones que realizaba para el Sr. Moscoso. ■ Como sabemos, ésta sería la otra situación contemplada por los estatutos que consideramos para que a un patrono, al negarse a emplear a una persona para una plaza para la que está haciendo gestiones para reclutar a un empleado, se le pueda reclamar por alegado discrimen en el empleo por la razón de que se trate, ■ 29 L.P.R.A. sec. 146, la que, como hemos visto, tampoco está presente en el caso de autos.

Recapitulando. Ausente el referido requisito de umbral para que pueda ser considerada en nuestros foros de justicia una acción en la que se reclama por un alegado acto discriminatorio en el empleo, prohibido al amparo de los estatutos antes mencionados, ■ forzoso es concluir que el único remedio disponible al Sr. Horta por razón de su despido injustificado -del que, en una situación como la de autos, la Ley Núm. 80, *supra,* hace responsable al Sr. Yassin aun cuando, por los fundamentos expuestos, tal despido le es imputable al Sr.

Moscoso- es aquél provisto por las disposiciones de la Ley Núm. 80, *supra*, remedio que le fue reconocido y concedido por el tribunal de instancia a dicho co-demandante. ■

## IV

Por los fundamentos antes expuestos y en mérito de lo que antecede, resolvemos que resulta procedente dictar sentencia confirmatoria de la apelada.

Lo acuerda y manda el Tribunal y así lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

## ESCOLIOS 99 DTA 148

**1.** Nos habremos de referir a la co-demandada, PMC Marketing, como Farmacias El Amal.

**2.** De otra parte, y en virtud de que en nuestra jurisdicción se ha reconocido que tanto el empleado que ha sido víctima de despido por un alegado discrimen, así como sus familiares, poseen una acción en responsabilidad extracontractual a tenor de las disposiciones del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, el Sr. Horta, su esposa e hijos incoaron una acción en daños y perjuicios bajo sus auspicios. Ahora bien, de igual forma se ha resuelto que la acción del querellante así como de sus familiares bajo este artículo no es una causa de acción independiente, sino que es contingente a que el tribunal determine que, efectivamente, el despido del empleado así afectado respondió a una razón discriminatoria y, por lo tanto, ilegal.

**3.** Véase Sentencia, Apéndice del recurso, págs. 71-72.

**4.** Véase Escrito de Apelación, pág. 5. Los demandantes señalan, además, como el único error adicional, que el foro de instancia incidió al determinar, textualmente que *"el interés de ... conseguir otra persona que hiciese el trabajo por menos dinero, razón que no satisface los de justa causa establecidos por la Ley [80]"* es prueba que refuta la presunción de despido por discrimen bajo la Ley 100 y ADEA.

A tenor de los hechos que concurren en el caso de autos y la conclusión que hoy alcanzamos al respecto, no se hará necesario entrar a considerar los méritos de ninguno de estos señalamientos de error.

**5.** Asimismo hace señalamientos encaminados a impugnar la suficiencia y la apreciación que de la misma hizo el juzgador de hechos en instancia.

**6.** Véase Escrito de Apelación del recurso KLAN-98-01160, págs. 7 y 13.

**7.** Véase Resolución de 15 de diciembre de 1998, Recurso Núm. KLAN-98-01159.

**8.** Véase E.N.E.P., Declaración del Sr. Juan Horta Merly, págs. 60-61.

**9.** Véase E.N.E.P., Declaración del Sr. Saleh Yassin, pág. 27. De su mismo testimonio surge que *"el proceso de negociación [de la transacción] empezó a mediados del año 94, para finales de junio o julio del 94..."*. *Id.*, pág. 25.

**10.** Véase Escrito de Apelación, Recurso Núm. KLAN-98-01159, pág. 3.

**11.** Fueron incluidos como demandantes, además del Sr. Horta, su esposa y la sociedad de gananciales por ellos constituida, así como sus dos hijos. Según indicado, estos últimos codemanados comparecieron como tales en virtud de las alegaciones de despido discriminatorio del Sr. Horta, ello al amparo de las disposiciones del Art. 1802, *supra*, y la jurisprudencia sentada por nuestro Tribunal Supremo en el caso de *Santini Rivera v. Serv. Air, Inc.,* 137 D.P.R. ___ (1994), **94 J.T.S. 121.**

**12.** En virtud de la determinación alcanzada por el foro de instancia en cuanto a la no procedencia de la causa de acción bajo la Ley Núm. 100, *supra*, y de la que hoy tomamos, nos abstenemos de exponer las causas de acción presentadas por los co-demandantes por concepto de daños y perjuicios apoyadas en las disposiciones del Art. 1802, las que son contingentes a que ocurra una determinación de que el alegado despido fue discriminatorio.

**13.** Véase Demanda, Apéndice del recurso Núm. KLAN-98-01159, págs. 3-4.

**14.** Véase Contestación enmendada a la demanda. Apéndice del recurso Núm. KLAN-98-01159, pág. 15.

**15.** *Id.*

**16.** Véase sentencia, Apéndice del recurso Núm. KLAN-98-01159, págs. 69-72.

**17.** El tribunal para el Primer Circuito de Apelaciones ha expresado este postulado en los siguientes términos: *"Consequently, the burden o proof on the ultimate issue of discrimination remains with the plaintiff, as in any other civil case. The plaintiff must prove that, even if the dismissal was justified, the defendant nevertheless violated Law 100 because the dismissal was motivated by discriminatory animus instead of or in addition to the legitimate reasons for dismissal. The Law 100 plaintiff is then in the same situation as an ADEA plaintiff after the defendant has articulated a legitimate, non-discriminatory reason for its actions". Alvarez v. Pepsi Cola,* 152 F. 3d 17, 27 (1st. Cir. 1998).

**18.** Atendiendo una reclamación atinente a un alegado discrimen por razón de sexo, en la que estaba envuelto un estatuto con una disposición similar, nuestro Ttibunal Supremo observó lo siguiente:

*"[c]ontrario a nuestra legislación [refiriéndose a la Ley Núm. 100, supra], el Título VII Federal requiere el trámite administrativo previo a la presentación de una acción judicial. Una persona que reclama violación al Título VII no puede instar una acción judicial hasta tanto haya tratado de agotar ciertas avenidas de remedios administrativos potenciales. [Cita omitida]. Sin embargo, no es necesario que la persona espere a que culminen los trámites administrativos ante la EEOC. La ley permite solicitar una autorización para instar demanda ("right to sue letter") a los ciento ochenta (180) días de haber presentado el cargo ante la agencia. [Citas omitidas].*

*[...] luego de obtener dicha autorización, el querellante tiene noventa (90) días desde que la recibe para instar la acción judicial. Matos Molero v. Roche Products, Inc., 132 D.P.R. 410. 477-478."*

**19.** Se refiere aquí el autor a la doctrina establecida por el Tribunal Supremo de Estados Unidos en los casos de *Adair v. United States,* 208 U.S. 161 (1908) y *Coppage v. Kansas,* 236 U.S. 1 (1915).

**20.** El Art. 2 de la referida Ley, 29 L.P.R.A. sec. 185b, textualmente dispone:

*"Se entenderá justa causa para el despido de un empleado de un establecimiento:*

*a) Que el obrero siga un patrón de conducta impropia o desordenada.*

*b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.*

*c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.*

*d) Cierre total, temporero o parcial de las operaciones del establecimiento.*

*e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.*

*f) Reducciones de empleos que se hacen necesarias debido a una reducción en el volumen de producción, ventas o*

*ganancia anticipadas o que prevalecen al ocurrir el despido.*

*No se considerará despido por justa causa aquél que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. Tampoco se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la Ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere a que se ordene su inmediata restitución en el empleo y a que se le compense por una suma igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo."*

21. Al respecto, nos ilustran las *"Guías para la interpretación y aplicación de la Ley Núm. 80"*, preparadas por la Oficina del Procurador del Departamento del Trabajo y Recursos Humanos, que la inclusión específica de esta disposición parece responder a la intención de dejar sin efecto lo resuelto por nuestro Tribunal Supremo en el caso de *Avilés v. Corte*, 69 D.P.R. 1 (1948), interpretando la Ley Núm. 84 de 12 de mayo de 1943 -antecesora de la Ley Núm. 50 de 15 de abril de 1949, 29 L. P.R.A. sec. 183 *et seq*., la que a su vez fue derogada en lo pertinente por la Ley Núm. 80 que consideramos- en el que dicho alto foro decidió que era razón justificada de despido que un patrono dispusiera de buena fe de su negocio a través del arrendamiento.

22. "*Un 'patrono sucesor' es aquél que ha adquirido una cantidad sustancial de activos, y ha continuado, sin interrupción o cambio sustancial, las mismas operaciones del vendedor, en el mismo local, con la misma fuerza laboral y personal de supervisión, elaborando un mismo producto u ofreciendo un mismo servicio con la misma maquinaria, equipo mediante el mismo método de producción de su predecesor. J.R.T. v. Cooperativa Azucarera, 98 D.P.R. 314 (1970), 323-324. De otra parte, las 'Guías' no examinan ni discuten el peso relativo que se le deba adjudicar a los restantes factores que informan esta figura.*"

23. Véase E.N.E.P., Declaración del Sr. Saleh Yassin, págs. 25, 25-30.

24. *Id.*, pág. 27.

25. Véase Sentencia, Apéndice del recurso Núm. KLAN-98-01159, pág. 68.

26. Véase Demanda, Apéndice del recurso Núm. KLAN-98-01159, Alegación número siete (7), pág. 2.

27. Véase Escrito de Apelación, Recurso Núm. KLAN-98-01159, Inciso número seis (6), pág. 3.

28. Véase E.N.E.P., Declaración del Sr. Saleh Yassin, pág. 27.

29. Véase Sentencia, Apéndice del recurso Núm. KLAN-98-01159, págs. 70-71.

30. Según expuesto, fue éste el fundamento de derecho utilizado por el tribunal de instancia para concluir, bajo el Art. 2 de la Ley Núm. 80, *supra*, que el "*despido*" del Sr. Horta no obedeció a justa causa, a tenor de lo cual le reconoció su derecho a la mesada.

31. Véase Sentencia, Apéndice del recurso, pág. 70.

32. A tenor de esta conclusión que hoy alcanzamos, resulta innecesario considerar los méritos de los errores señalados por la parte demandante. Ello no obstante, y ante la realidad de que el foro de instancia consideró las alegaciones de despido por razones discriminatorias por edad, aun cuando las desmereció, nos pronunciamos al respecto en el sentido de que aun cuando hubiese procedido considerarlas, "*ante la norma fundamental de nuestro ordenamiento jurídico [de] que un tribunal apelativo no intervendrá con las determinaciones de hecho ni con la adjudicación de credibilidad que hizo el juzgador de los hechos salvo que haya mediado prejuicio y/o error manifiesto de su parte". López Vicil v. ITT Intermedia*, 142 D.P.R. ___ (1997), **97 J.T.S. 42**, pág. 838. Sin que surja del expediente ante nos que tal es el caso, nos merece entera deferencia la

conclusión del foro apelado de que *"El Amal ha demostrado con preponderancia de la prueba a nuestra satisfacción que el despido de Horta no fue discriminatorio [por razón de edad]"*. Véase Sentencia, Apéndice del Recurso Núm. KLAN-98-01159, pág. 71.

33. Véase E.N.E.P., Declaración del Sr. Juan Horta Merly, pág. 61.

34. De hecho, así fue determinado por el foro de instancia al concluir que *"Yassin no le ofreció otra posición en la compañía, pues entendió que no tenía plaza que ofrecerle considerando las funciones que ejercía y el salario que devengaba [el Sr. Horta]"*. Véase Sentencia, Apéndice del Recurso Núm. KLAN-98-01159, Determinación de hechos número 27, pág. 66.

35. De otra parte, el hecho crucial de que la reclamación por el despido alegadamente discriminatorio del Sr. Horta fue instada luego de que ocurriera el traspaso de las Farmacias Moscoso, hace inaplicable al caso de autos lo resuelto por el Tribunal Supremo en el caso de *Bruno López v. Motorplan, Inc. y otros*, 134 D.P.R. ___ (1993), **93 J.T.S. 123.**

36. En su virtud, totalmente inmeritoria es la contención de la demandante, partiendo de la base de la existencia de una relación empleado-patrono --la cual hemos determinado que no es correcta-- de que procede decretar que el despido fue discriminatorio por el hecho escueto de que el juzgador determinó que el mismo fue uno injustificado. Según fue expuesto en la parte IIA de esta Sentencia, aun cuando la inexistencia de justa causa para el despido activa la presunción de discrimen, 29 L.P.R.A. sec. 148, el juzgador no viene obligado a determinar que el mismo fue también discriminatorio, ya que la presunción es controvertible. Así, para que pueda sostenerse un dictamen basado en despido discriminatorio no basta con que se concluya que el despido fue sin justa causa, sino que tiene que surgir, y concluirse, que el mismo fue con intención o propósitos discriminatorios, *Soto v. Hotel Caribe Hilton, supra,* lo cual conlleva que el patrono aporte prueba preponderante que persuada al juzgador a así concluir, ello en atención al peso que le impone la Regla 14 de las de Evidencia, *supra*. Persuadido a tenor, no incide el juzgador que decreta que un despido, si bien es injustificado, no responde, a su vez, a una intención o propósito discriminatorio.